also known as Fish Appellant. Mr. Ripke for Appellant Hillary Price, Mr. Matadu for Appellant Ernest Glover, and Ms. Heffernan for the appellate. Good morning. As I understood the division of argument, you're going to be doing the truck plug issue, is that right? That's correct. And Mr. Matadu is going to do the Bellington issue. That's correct. And I'll also be addressing how the truck bug evidence and the evidence against Mr. Price discussed here is so prejudicial that but for it, the result of the verdict here would have been not guilty. When we're talking about prejudice in regard to the truck bug, it makes sense obviously to go right to the tapes. What the jury was told over and over again is, quote, I know brother wants a gallon. Quote, if he got the effing gallon sale, shoot, by the end of the week, I should have the other 200 and by then I'm gone. Which stuff are we going to give brother, the old water or the new water? I edited those when I set them to take out some words because these are graphic recordings and that's the exact point the government made at oral arguments, excuse me, at closing arguments for the jury, that these truck bug recordings afforded the jurors the opportunity to hear this stuff unfiltered. There is no evidence whatsoever in this case against Mr. Price that would tie him to PCP specifically or even a PCP conspiracy except for what's on the recordings of this truck bug. Can we reconcile your argument with what the panel described the evidence to be against Price on the direct appeal? Didn't the panel use the words, I'm trying to remember, but they didn't say a mountain of evidence, but they described the evidence against Price and Ernest Glover as being quite substantial. Thank you for the question, Your Honor. If you factor in the truck bug evidence, it's a nail in the coffin. If you factor in the agent Bennington and all that evidence was what the panel had at its discretion to consider on the direct appeal. These quotes I'm giving you, if you're saying this is how we're going to split it up, there's no other evidence that talks about my client. So, brother, these his regular people. They get to calling me and saying it ain't right, it ain't like it used to be. Honestly, I'd rather just give him the good water. That's what the panel had on direct appeal. That's what should never have been admitted. It gives them not only the idea that it's PCP, but it gives them the idea that this man had customers over a period of time, that the supplier knew the customers below, the next level dealer, and that he was trying to maintain a good relationship because it was something that was occurring over a continuum. None of that stuff at all would have come in, came in any other way but through this truck bug as it relates to Mr. Price and from Mr. Glover as well. This truck bug was extraordinarily incriminating. So that's how I reconcile it, notwithstanding the Bennington stuff as well. We know also that it was that significant because the jury acquitted Glendale Lee. Glendale Lee was the only co-defendant who was not mentioned on the truck bug. So there is a clear delineation about what the jury did here. Glendale Lee was caught with 22 drug vials in his residence, all of which tested with PCP. Glendale Lee was on the recordings with subs where subs was saying, was complaining about Lee. He's telling people about what we're doing. We're going to get a snitch. We're going to get in trouble. He had Glendale Lee on the tapes talking about two of these and two of these and how much quantity they were dealing. The evidence against Glendale Lee was more significant than the evidence against Price if you carve out this truck bug evidence, which Glendale Lee obviously wasn't mentioned on, which I think explains the difference of what happened there. The jury, if you didn't have the truck bug evidence and the government has discussed the other evidence, Your Honor, the tapes and other things like this, there's conversations which, as the government set a trial, they appear to be not talking about what they're talking about. But none of those recordings mention drugs at all. They could be about any other kind of thing, and it could be about drugs that have nothing to do with PCP. Assuming we find prejudice, how do we reconcile, I guess, the merits as far as deficient performance given the state of the law at the time of the trial? Thank you, Your Honor. I believe that the standing state of the law at the time of the trial was the same as it is today. There, and how this was divided up, I mean, the reason, the problem here is that the truck was parked in Maryland. The truck wasn't my client's truck or Mr. Glover's truck. So it was not in much of a misunderstanding about the law, I feel like, because it wasn't oversight on the fact that the truck wasn't in the jurisdiction at all when it happened. But do we have any evidence in the record about why it wasn't raised? Well, there wasn't a hearing below, so we don't have testimony exactly. But, I mean, there could have been a declaration or an affidavit submitted, some sort of a record made, right? To show why it wasn't raised at the time? Yes. Well, of course that's possible, that that could have been done. And we don't know why, but we can't assume. I guess what we look at is Suggs. The district court had no problem finding that Suggs' lawyer committed deficient performance by not raising the issue, and that that holding was clear. If the difference that the district court saw was outstanding. But Suggs had communications of his that were introduced against him at trial from the truck bug. I agree, Your Honor. The question was on standing. If you, and we briefed that well for the court, both sides have. If you find that we do have standing, which I believe we do, then I think the question of deficient performance is clear and falls in our favor just like the district court did below. That issue turns on the standing question. But isn't Suggs' standing a lot easier to see, so to speak, than your client's standing? I think I would agree it's easier in the sense that Suggs' standing is Title III standing and arguably also Fourth Amendment standing. But Title III standing is, there is Title III standing, and Title III standing is sufficient. So I guess while it may be more clear because it also fits the notion of, you know, your voice is caught on the recording, that that's maybe perhaps more intuitive. It's not intuitive. The law is more clear. It's expressed in the statute, right? Well, yeah, Your Honor, that just goes to the statute. The person was a party to any intercepted wire communication. Yes, Your Honor. Right? So that is expressed. So there's just no doubt that Suggs had standing. And I don't think there's any doubt that Price does either because it was directed at him. Well, the question is what the meaning of directed at is. That's the problem. And racist suggests that it's a different meaning than the one. I'm not saying racist is decisive or anything else, but it certainly clouds the waters as to, or whatever the appropriate metaphor is, as to standing in a way that there were no clouds for Suggs. That distinction is accurate, Your Honor. In terms of how cloudy it is or not, I think that it's clear that the type of standing target, the way target is used in racist in that kind of context is different from how this Court used it in scurry. And I think I would encourage the Court, as I know you already have, to read the district court decision in Ford that recently spelled this out, you know, more explicitly than maybe it had been in other ways. But in racist, the Court expressly says two things. One, that the point, Title III was intended to accept standing laws. It was at the time. And it says Alderman is a standing law at the time. And it says that the Court in Alderman left no doubt that it rejected the theory by holding that persons who were not parties to unlawfully overheard conversations or did not own the premises on which the conversations took place did not have standing to contest the legality of the surveillance, regardless of whether they were targets or not, goes on. I'm not saying that decides the question. And if we were the Supreme Court, we would reinterpret or could interpret what racist meant. But it certainly raises the question, to put it in Strickland terms, was the lawyer below not acting as a lawyer when he didn't realize that his client would have standing here? That's the way Strickland puts the meaning of ineffective assistance of counsel. So serious that the counsel was not functioning as the counsel guaranteed. Thank you. Thank you, Your Honor. In this context, we're talking about a pretrial suppression motion in a criminal case. What I believe the standard is, and this happens, as Your Honor knows, all the time, if there is a colorable argument for it, if the government here has admitted at the very least that the law is unsettled in this area, if you're in a criminal trial and the government is saying, well, we don't have any case that proves you're wrong, it's unsettled, we'll give you that, how do you not litigate that issue in a pretrial suppression hearing? So I do believe it was deficient performance for them not to raise the issue for the same reasons as it was found for the counsel in Sud's case. And I think that this Court's prior precedent in Williams and Belosi, which described it as a clear, unambiguous mandate, the standing issue, addresses the racist argument that's drawn from that footnote. Do you have any case law that says what you're effectively saying, in a pretrial suppression hearing, because it's a different setting, the burden is different than what we would normally apply in assessing counsel's competence? In other words, the way you threw out your assertion was, well, it's a different context, so in measuring it, it's different than you might otherwise consider, Your Honor. That means you have to assume that a counsel in that situation is going to throw everything at the wall. Is there any case law that says something to that effect? Yes, Your Honor. I have Third Circuit and Seventh Circuit decisions in other 2255 cases which are cited in our reply brief. The Third Circuit case is Thomas v. Varner, 428 F3D 491. The Rodriguez decision from the Seventh Circuit is 906 F2D 1153. They both say basically because there was a colorable argument in support of the suppression motion, counsel's failure to act on it was objectively unreasonable. So there's no – I was looking for colorable arguments. I couldn't find any either in our circuit or in the Supreme Court. Neither of those authorities use this point, right? I would agree with you, Your Honor, if I had those. I figured. Fair enough. Fair enough. Yeah. But, I mean, there isn't anything – I mean, the Third and Seventh Circuit decisions are sound on this ground. The Seventh Circuit one is from 1990. It's been around a long time. It's not gone anywhere. And, frankly, I mean, this is a unique scenario. It fits with common sense, though. When you're in a suppression motion – Why is it a unique scenario? I would have guessed it would have come up a lot. Therefore, I'm surprised that there aren't cases on it. Williams – I don't think I can read Williams the same way you do because the actual holding of the case is that appellants contend that any use of information from the unlawful 7073 wiretaps produced a flaw in the ensuing wiretaps. And, therefore, they may complain even if their own voices were not overheard or their own premises were not involved. That argument has been rejected by numerous courts. We agree that an accused is unable to attack in this indirect fashion those wiretaps that it could not challenge directly. My understanding of that is that they're talking about ensuing orders after the first one, which is different here. There was an order, and then there were several subsequent orders. I don't disagree that it's a distinguishable case. I just don't think it supports your proposition, that's all. I mean, I think it has words that suggest against, but I agree it doesn't resolve your case. But you were citing it as if it were dead on precedent for your point. I understand the question, Your Honor. It says, it does say in there, scurrily directed at standing, and that's the way the government cited this case in their initial memorandum in the district court, that it included directed at standing. I think that if we read the scurry decision, if we look at even the precedent from Pelosi from this court, they really, I respectfully submit that the notion that it is directed at standing straight from the statute is fairly unambiguous. There's no doctors directed against standing, not directed at, but directed against, right? Directed against, yes. And the question is, what does it mean? It's a great question. It is a great question. I mean, unless we're going to read it in a way that it means absolutely nothing and it disappears from the statute, it talks about people at whom they're directed. In this one, we checked every one of those boxes except for his voice being on the recording. His name is, they used his evidence and his name to get the affidavit in the first place. In the judge's order, in all the subsequent orders, his name is in there. He's called a target. They're obviously, they say we want to go after that vehicle because he's been in and around it and over it. When you say that it would leave nothing in the statute, and I'm not sure it says, the statute says it means a person was a party or a person against whom the interception was directed. Those are the two categories in the statute, right? So somebody whose house is targeted, whose own cell phone is targeted, whose own landline is targeted, whose own truck is targeted, but who's not a party to the conversation, would come in as a person against whom it was directed. So there is a category that it would fit. I appreciate you have a different argument as to another group you'd also like to fit, but the government's reading doesn't make the statute, perfectly phrased, irrelevant. Well, I understand the point. Your Honor, that's very good. I think in the circumstance you gave just then, the example would include the traditional Fourth Amendment standing. Yes, that's right. So that's right. And that would fit with, I don't know what the right answer here is, but I know enough to know I'm confused. And Rakes suggests that it's the Fourth Amendment standing that was provided by Title III. I understand what Your Honor is saying about Rakes. I don't agree with that interpretation of it. I believe the way this Court has handled it, these decisions coming back, and I understand what Your Honor said about Williams, too, and looking at Pelosi as well, which the government, when they made their alderman argument, the footnote, which Your Honor mentioned, Pelosi addressed that issue and reconciled those two things from this Court decades ago. And I think that it did it as well as could be done. It squares it up at the time. I don't know how you read Scurry or, you know, what's happened since then, in a way, if you're not recognizing that there is that element. And that numerous other courts have, not the Supreme Court squarely, although I can give Your Honor Giordano, 416 U.S. 505, 1974, indicates that Title III standing and Fourth Amendment standing are not identical. I don't want to beat a dead horse here, particularly since I don't know what the right answer is. But Scurry just says, covers anybody who is a target or a person party to a wiretap intercept. And target is just, obviously, the court's use of directed against. And we don't know what that means. We don't know whether the target is the person whose phone it is or the person whose property it is or whether it means, which is the government's argument, or it's what you mean. But Scurry doesn't have any holding with respect to that question. I submit that the best and most reasonable interpretation of directed at would include Mr. Price and Mr. Glover under these facts, given all the information. And when other courts have addressed this issue more squarely, other district courts, that's what they've looked to. Are they in the orders authorizing the warrant or not? Were they trying to get them in order to get the warrant? And they rely on them to get the warrant. There's a mix of district courts on this. I agree with that. Okay. Are there further questions? Okay. Thank you very much, Your Honor. All right. And now we'll hear from Mr. Maddu. Yes, sir. Okay. And you're going to talk about the validity issue? Yes, Your Honor. Great. Your Honor, in terms of deficient performance, this court's precedence in Hampton and its progeny couldn't be more clear. When a lay witness provides interpretations or opinions to the jury without identifying his or her objective basis for that opinion, the testimony violates Federal Rule of Evidence 701. In this case, the proffered basis for Agent Bevington's lay opinion testimony in the district court was that he had this institutional knowledge of the entire investigation and having listened to all the intercepted conversations in this case. That proffered basis was insufficient. Below, the district court would not entertain that categorical objection and instructed trial counsel to object line by line, which counsel wholly and entirely failed to do. So does that lead us to no ineffective assistance at the trial level because trial counsel made the objection? I wasn't sure I was following what you just said. Where do you end up? Well, that objection wasn't entertained. So that means the district judge erred, but it doesn't assume you're right, which I think you are. But it doesn't mean the counsel is ineffective. It just means the counsel's argument wasn't accepted. I disagree, Your Honor, because at that point, the district court is saying, I don't like this testimony. I don't want Agent Bevington to be a mouthpiece for the government, and I need trial counsel to object line by line on that basis. And in the trial, throughout the trial, that's exactly what Agent Bevington did. He was a mouthpiece for the government. Both Price and Glover were prejudiced in this case for three reasons. Are you saying then that is there any of Bevington's testimony then that could have been acceptable had there been a line by line objection? Was it an all or nothing thing, or was it? Are you saying that some things were okay and some not, and the problem here is that the counsel didn't go ahead and object to the things that were not okay? Our position, Your Honor, is that any time Agent Bevington provided an opinion or an interpretation of a word, phrase, or an entire series of conversations without identifying the objective basis for that testimony, yes, it violated Hampton and it violated Federal Rule of Evidence 701. The failure to do the line by line objection, you're saying, was inefficient? Correct, Your Honor. So both Price and Glover are prejudiced in this case for three distinct reasons. One, the dominant role Agent Bevington played throughout the trial. Two, the lack of overwhelming physical evidence against either appellant. And three, the fact that when you strip away the recorded conversations and Agent Bevington's interpretation of those conversations, there's no other evidence that goes to establishing the conspiracy itself. Regarding the dominant role played, this Court knows that in a nine-day drug conspiracy trial, the government called Agent Bevington a total of eight times for the principal purpose of playing recordings, both from the truck bug and Mr. Sugg's wiretap phone, and then having Agent Bevington summarize those conversations in a conclusory fashion, essentially boiling it down to the ultimate issue in this case. On what is perhaps the most egregious instance of Hampton error, the government plays a series of phone calls where Suggs and Glover talk about getting together and they use terms like pocky book or broad, and after these five or six conversations, the government asks Agent Bevington simply, well, what's going on there? At that point, Agent Bevington summarizes what is the entire issue of this case at the trial and says, well, what was going on is Mr. Suggs sold Mr. Glover a quantity of PCP. Mr. Glover resold that to another customer. Well, actually two customers, one of the customers had complaints about the quality and the other one didn't. That establishes the prejudice in and of itself. It doesn't take but a little bit of poison to ruin the drinking water in the entire well. Agent Bevington's dominant role is one reason this court can be satisfied that both appellants were prejudiced in this case, but in Williams, this court sets up a distinction between cases where Hanton error occurs and the defendant is also facing quote, overwhelming physical evidence versus another case where the defendant is not and the bulk or the key portion of the evidence against that defendant is the recording conversations as interpreted by Bevington. For both Price and Glover, they fall in that latter category. You know, in Suggs, obviously, the court was presented with a different scenario. That case included an overwhelming amount of PCP that was found in this home, but beyond that, Suggs was recorded acknowledging the existence of that, talking with another co-conspirator about that. In this case, the evidence that was found in Ernest Glover's home... He was, on what recording was he doing that? On Suggs' wiretapped phone. He's having a conversation with his girlfriend. And was that with clarity or is that one that Bevington interpreted? That is with some clarity. They're talking about the odor and police being outside and that if you know the odor, you know the odor. Is that one that Bevington said, odor means PCP? In other words, he was giving an interpretation meaning that they're talking about PCP? I will have to check on that and respond. Because our court then says even assuming error in all this, the evidence was still sufficient, and I guess that would have to have excluded Bevington's testimony about that conversation, right? That was not a conversation on the truck bug, and I don't think it was excluded because of Agent Bevington's interpretation, which sets up the distinction between what was found in Ernest Glover's home, which we submit does not go to establish a conspiracy at all, and the overwhelming physical evidence that was located in defendant Suggs' home. And what was the evidence for Glover, the physical evidence? Throughout the home, there is money located in Glover's bedroom. There is drugs found in Ernest Glover's, at the time, minor child's bedroom. There's also some vials and PCP found in the basement. As we stated in our moving papers, beyond what was found in the home, nothing goes to proving the actual conspiracy itself. If anything, the evidence found in the home goes to prove an entirely different crime altogether, that is, possession with the intent to distribute, not conspiracy to possess. And the 404B evidence about the prior sales? Same issue, same point? Your Honor, I think even considering the 404B evidence, which was admitted for a limited purpose to prove knowledge, again, even in that light, the evidence itself doesn't go to proving the conspiracy. But I thought that the defense at trial was that there was a conspiracy, but there wasn't evidence that your client joined that conspiracy. I think that the defense at trial was that these recordings could be interpreted in a number of different ways, and that Ernest Glover was not a member of the overall conspiracy. I think that's correct. Further questions? Thank you, Your Honor. Ms. Heffernan. It is the Court. Patricia Heffernan on behalf of the United States. Picking up on the Bevington issue first, all of the drug and paraphernalia in Glover's home certainly informed the jury's inference and informed the jury's understanding of the calls and was significant proof of Glover's participation in this drug conspiracy. And I disagree wholeheartedly. The Suggs evidence is absolutely relevant evidence in determining whether or not Glover and Price were members of the conspiracy. What the calls as a general matter show, looking at them in their entirety, is you have Suggs, who is distributing massive amounts of PCP. He's having repeated calls with both these defendants and others that show that he's supplying something to them, and they're supplying something to customers below who are pressed for it and are in need of it. Are these as interpreted by Bevington? No. Thank you. There were 80 calls admitted at trial. Bevington opined about 10 of them. To read the appellant's brief, you'd think that he spent the entire trial opining, and that's absolutely inaccurate. There were, I think the district court said, 51 calls or so that he said absolutely nothing about. Some of the calls, he simply explained to the jury what was going on at the time. He, with respect to Juju Johnson, said that he was bald. And during one conversation, he explained to the jury that the wiretap room, that they, after they got this call, they sent two guys out, two agents out to surveil the meeting. And then he explains that they called off the surveillance because the telephone calls between the two indicated that they were aware. They had seen the antennas, and they knew that they were being surveilled. So the wiretap room told them to call it off. So sometimes what he was saying was simply giving some background about what was going on at the time. And I just, Beddington was called repeatedly, both because he testified at first as an overview witness, and then he introduced all the calls. And the government kept the evidence separate with respect to each defendant. You know, there were four defendants at trial, and then there's also all of the Lonell Glover information that informed the conspiracy, the evidence in the conspiracy also. So that's why he was called repeatedly. With respect to deficiency on the Beddington issue, Hampton was decided after these defendants' convictions were affirmed on direct appeal. And the opinion in Hampton relies really on Second Circuit case law. So it's not at all accurate to say that counsel wasn't performing as a counsel guaranteed by the Sixth Amendment, at least certainly on appeal, by not relying on Hampton. And with respect to the question, this question of the district court telling the lawyers that she wanted them to go line by line after first overruling, first the court overruled the objection citing Island, which was this district court case, and then spent some significant time explaining how she didn't like the way the government was trying these cases, having Beddington or an agent testify about all of the calls. And as she noted in her district court opinion, I can't remember whether it was in Suggs or in this case, but in one of the 2255 opinions, she noted that was effective because the government, in fact, put in very little of Beddington's opinion. And that's accurate. So I think when she said that she wanted the lawyers to go line by line, she was referring to this notion that, A, I'm not going to let you put your whole case in this way. She overruled the objection, but said you can't try the whole case this way. You've got to be moderate with respect to the amount of opinion that you elicit, and you have to make sure that there's some stated basis. But that's not what she said. I mean, when she says line by line, she's directing it to defense counsel, not to the government. She's not admonishing the government. I agree, but I think it's not crystal clear, but I think what she was saying was, after discussing how she didn't want the government to try the case in this manner by eliciting so much opinion testimony, I think she was saying to defense counsel, we'll go line by line, because at some point I'm going to put an end to all of these opinions. Or if there's an opinion where they don't state a basis, because she's discussed this notion of, how can you say a hair dryer means PCP? And then she says, I'll just have to hear the testimony. But I think what she's saying to defense counsel is, we'll go line by line, not with respect to an Island Hampton type objection, but with respect to the amount of opinions that are elicited. I think at the end of the day it doesn't matter for this court which way it reads it. I think the transcript is a little confusing, but that's the government's reading of that transcript. I don't think she said, she first rejected the objection on Island grounds and then kind of backtracked on what she was saying. I think she... Are you saying the defendant raised this objection below or didn't raise the objection? They raised it below. So what does that get you with respect to appellate? The appellate counsel. Yeah. Yes. With respect to appellate counsel, Hampton had not been decided at the time of the direct appeal, and all that was still out there was Island, which under the Island District Court opinion, which the district court followed, it appeared that... The Island District Court opinion is not authoritative for trial in any way. I understand. Yes. And Hampton hadn't been decided, so there was no authoritative opinion in this circuit. Well, didn't we read Hampton? And Hampton basically reading Rule 701 on its face to require this? Well, I think Hampton also relied on Second Circuit case law. Which read Rule 701 on its face to require this. Well, saying it... What's logical in case law? You've got the rules. It's pretty clear what 701 says. Well, 701 does not... Yeah, on its face it does say what it says. It does say what it says. And it's pretty clear there's a problem here. Well, it... I'm trying to figure out where you're arguing. So you're saying, okay, we understand there's a 701 problem. You need Hampton to say that. There was a 701 problem. Are you saying there was no prejudice? Are you really seriously arguing there was no 701 issue? You're saying they raised the objection? No, no, no. We're saying they raised the objection. Okay, so if there's any burden that's on appellate counsel... And on appellate counsel, our position with respect to appellate counsel is appellate counsel isn't required to raise every issue that's out there. There were a lot of issues raised on the direct appeal. And they're not deficient simply because they didn't present this particular issue. It's a pretty big issue. Well, and that gets me to the prejudice. We don't think it is. And we spent, I think, 13 pages in our brief kind of outlining why this wasn't prejudicial. And I think that the court... It's very easy for the court to dispose of the issue on prejudice grounds. Because, as I said, there really weren't that many opinions. Most of the opinions, Bevington either stated his reason on the record or it's quite plain and implicit from the record why he issued that opinion. There are only two opinions that the district court pointed out where he didn't say anything. One of them was this Activation 87, and that was a conversation between Suggs and Parker. And it was elicited by Suggs counsel, where Suggs counsel says, they say they're going to get together tomorrow. How do you know they're not getting together for gambling purposes? And Bevington simply says, first of all, I can see that he can't say why they're getting together. And then he simply throws out, you know, I think it's something different. That was Defendant Parker. So that can't possibly be a problem here. And then the second opinion is the one, it's Activation 248, which counsel referred to in his argument. And there it was a discussion that there were a series of calls over three days where they kept discussing how Suggs was going to provide something. What he was going to provide kept changing. It was Sister Sister Magazine or a sample of that book. Information. Or, yeah, information, information. And ultimately the final call is this extended discussion. In the final call there's an extended discussion about women.  As we say, as we outline in our brief, why this conversation could have been about women. And the district court found that de minimis. And that's because at that point it made more sense to cross-examine than move to strike the opinion. Because the opinion had been the jury understood what his basis was and the flaws in the opinion. And that was made very clear for the jury. So with respect to that, that's the only other call where he does state a basis that is not either absolutely in the record, as we showed in our brief, or implicit from the discussion. And as she said, sometimes the opinion was a plausible reading. Meaning it's just obvious from the language of the conversation itself. Let me tell you where I have a problem. In my training to be a public defender way back many moons ago, one of the things that we had was evidence blocking 101. It was like basic to being a criminal defense lawyer that you first try to block the government's evidence that's going to be inculpatory. If that doesn't work, then you figure out how to mitigate it on cross-examination or whatever. I mean, here there wasn't even an objection in coming to the bench and saying, before he gives this opinion, we'd like to know what he's going to say and what his basis is. So that you're not put in a position of having the jury to hear it first and then try to figure out how you're going to unring the bell, put the toothpaste back in the tube, whatever, move to strike it, mitigate it. I mean, none of that was done. And that's like 101, criminal defense. So why isn't that deficient performance? We can't say he wasn't functioning as a counsel guaranteed by the Sixth Amendment. And if, as I said, there were 18 times. The test isn't if it's ideal. It's just whether it's counsel who falls so far below. If it's ideal, I think that's a low standard. That's just kind of a base standard. That's all Judge Wilkins is saying. It's not like it's so basic that it's uninteresting. I think this is a difficult conversation to have in a backing because I think you need to look at the particular opinions that are being elicited before, you know, if it's so obvious. No, wait. We don't want you to object. Wait, to help me, okay? You heard what Judge Wilkins said. So take that as a given and accept my proposition that it's pretty straightforward, that any defense counsel would understand it. And there was that feeling. So now the question that he's raising for you is, if we're right, how does the government respond? I think sometimes it was so obvious from the conversation itself. It's reasonable for a defense counsel not to stand up and object every single time there's something that's potentially objectionable. And here, where the opinion was either going to be so obvious from the language itself or from the calls that preceded it. For example, again, you had the jury heard three or four calls where they're talking about Sister, Sister Magazine. What they're discussing, the object keeps changing, but it remains the fact that he's trying to get something from Suggs. And it's obvious from the calls that were played right before it. Your scenario was assuming it's going to come in and do the line by line. Judge Wilkins has said, no, that's not the way you do it if you're average defense counsel. You try and block it first to protect your client. Don't let it get to the jury because then you can't get the toothpaste back in the tube. I mean, that seems so straightforward. It really is uninteresting. That's a straightforward proposition. And what he has asked you is, why is that not sufficient when you don't even try? Now, if the trial judge says no and you're forced to go forward, then we're in a different scenario. Some of these opinions weren't at all powerful. You're talking about a conversation between Parker and Suggs. It has nothing to do with the liberal argument. So your argument is, we'll accept that it's true, but as it turned out, there was nothing that was prejudicial. That's your argument. No, our argument, and I'm not sure I have much more to say than this, is I don't agree that it's deficient if you don't object to every single thing that you think you possibly can object to to keep it out first. We disagree with that. Some of these opinions were not at all prejudicial to these defendants. Some of them, as I said, it's obviously the objection is. I think you might not hear what Judge Wilkins says. You said you approach the bench and you make an inquiry and you'd like to know what's coming. We don't want to be put in a situation where the jury hears it first and then we're scrambling. And he's asking, why wasn't that done? That's not a blanket we object to everything. That is a request to the judge, wait, let's hold off some of this stuff that apparently is going to violate 7.01. We might have a sense of it and pose our objection now so the record's clear. Why is that? Now, if your answer is, well, as it turned out, it was no big deal. You're right, that's probably what should have happened, but as it turned out, there was nothing that was prejudiced. Is that your argument? Well, our argument depends on the call we're talking about. In some of these calls, it was so obvious what the basis was going to be for the opinion. As I said, for example, they played three or four calls that lead up to this opinion. It was just a clear loser. And counsel's not deficient for failing to raise an objection that's going to be an obvious loser. Moving on to the truck bug issue, just briefly, as I think the exchange indicated, Williams does not stand for the proposition that defendants who are in an appellant situation clearly have standing under Title III. Rackus, in fact, suggests the very opposite. And so it can't possibly be the case that counsel was deficient in failing to assert standing with respect to these truck bug communications. It's objectively reasonable to conclude, especially for Rackus, that it looked like that, in fact, was not at all a good, feasible argument to make. Can I understand what your position is as to how we're supposed to interpret the statute? I mean, aren't we required to look at the language of 25-10-11 for a grieved person and just interpret that language? I mean, what does Rackus have to do with this? Rackus has to do with – our argument is the court shouldn't be interpreting 25-10-11 at all. That's not what the court should do on appeal from a 2255. This is a collateral attack, and so the court shouldn't decide the merits. Here where the merits are so unclear, and the question is whether counsel was deficient, the answer is counsel couldn't possibly have been deficient because the merits are so unclear that you can't say that he's not functioning as counsel guaranteed by the Sixth Amendment. So we don't think the court ought to be interpreting 25-10-11 in this case. Well, here's why I guess I'm going to push back some here. You're saying the merits are unclear because of Rackus, however you want to pronounce it. That begs the question of what relevance Rackus really has to us. When the motion to suppress under Title III isn't brought under the Fourth Amendment, it's based on the language in 25-18. Yes. Our position is Rackus' discussion, and also Alderman, where the Supreme Court has said that the 25-10-11 standing is consistent with Fourth Amendment principles. Given that, to the extent it's unclear. None of those cases were deciding, I guess, a Title III motion to suppress, right? That's right. That's right. But what Rackus was saying, Rackus was rejecting this notion of a target theory. And I think it's clear that this Court has not decided the issue. That's clear. And because this Court has not decided the issue, and the Supreme Court hasn't decided the issue, and the discussion in Rackus suggests that the government's got the better of the argument here, that 25-10-11 ought to be read consistent with Fourth Amendment principles, which is you need to establish that your own privacy interests have been invaded. It can't be that counsel was deficient in failing to assert, move to suppress by asserting this standing ground, which is unsupported. And looks, at least, Rackus suggests that it's the government's view of the statute that prevails. Well, let's suppose a conversation of prices had been intercepted from the truck bug, and it was a conversation where he was just standing outside of the truck talking to Lonell Glover. And the truck bug picks up the conversation. They're just standing there. Does he have some sort of privacy interest in the conversation that he has standing on the street next to a truck? Yes. Under the Fourth Amendment? Yes, he was picked up. His privacy interest was invaded. So he has standing under your scenario. Under the Fourth Amendment, just because they happened to pick up his conversation? He was intercepted, yes. So someone standing next to him who he's talking to but who never utters a word, they don't have any privacy interest in the conversation because they never uttered a word. Correct. And briefly, with respect to the issue of prejudice, we, at pages 27 through 31, I think extensively describe how, in fact, if you take out the truck bug activations, given the volume of evidence and the character of the phone calls, both with Glover and Suggs, Price and Suggs, and also as informed by the other conversations Suggs had with their co-conspirators, there is no reasonable probability of a different outcome. And I did want to just point as to Glendale Lee because he was mentioned. Glendale Lee was somebody who was living in the basement of Suggs' grandmother's home. And these vials had residue in them. They were in a gym bag somewhere in the basement where he was sleeping. And his phone calls where he wanted one for me and one for Doc really made him look like a user rather than a conspirator. And so I think that sort of explains the jury's verdict as to Glendale Lee, that he was a very, very big player in the relative scheme of things. Let me ask you about Title III generally. So in 2520, which authorizes recovery of civil damages, Congress said that a person could sue and receive civil damages. It says any person whose wire, oral, or electronic communications is intercepted in violation of this chapter. So they made it very clear that civil damages would be limited to someone whose communications were intercepted. So they knew how to do that. Why didn't they do the same thing then in 2518, the motion to suppress provision? Because I don't think they're trying to just limit it to people whose communications are intercepted. We think they're also trying to include as a grieved party people whose homes have been bugged, their phones have been bugged, their computers have been bugged, their cars have been bugged. That's our view of directed at. And so I think that's the distinction. So that's the work that against whom interception was directed means? That's the government's view of it, yes. So then why didn't Congress use a grieved person in 2518-4A, which is the provision about who is entitled to an inventory once there's been an interception? I have to say that I have not focused on that provision, so I don't have an answer to that. Because there Congress said the inventory must be served on persons named in the order or the application in such other parties to intercept the communications as the judge may determine in his discretion that's in the interest of justice. But they could have just as easily said a grieved persons there if it means what you say that it means. I have to say I haven't given a whole lot of, you know, I haven't focused on that, the inventory provision as opposed to the, but the fact that Congress might find that different aspects of what happens when a wiretap is authorized might impact different people different ways, which I don't think undermines the government's view of what it meant in 2510-11. If there are no further questions, we'd ask that the order be affirmed. Okay. I think both are out of time, right? Do you want to have a minute apiece or a minute, minute apiece? Thank you very much for the honor of discussing this issue today as well as the additional time that was provided. Briefly, I agree this is a statutory interpretation question, not a constitutional Fourth Amendment question. It has to do with what the statute means. The court, I know, has looked at the information provided by the amicus that was appointed to the Federal Public Defender's Office at page 842 in the joint appendix. There is some legislative history information there. I believe from Senator Hart talking about the intent that it would cover folks like my client. Unfortunately, that's Hart's dissenting opinion objecting to Title III. There's also, if the court looks at page, excuse me, our brief, where we address the racist issue in response to what they had to say there, I do think you look at the individual blocks of the statute and look at that separately from the constitutional issue. That's what the district court did in Ford. That's what happened in Scurry. There wasn't an addressing. There was a recognition that the two were distinct from each other. And the Supreme Court precedent I cited earlier also addressed the same thing. Briefly, what was mentioned in terms of prejudice on this issue was we referred to Glendale Lee. I know that Mr. Lee would have probably, like the government's argument here today, would have been made for him to trial because they certainly argued the evidence very differently there as they did here. This was obviously extremely prejudicial. Counsel should have raised the issue, and if it had been raised, we respectfully submit that the result of this would have been not guilty. Thank you very much. Thank you, Your Honor, for the extra time. Very briefly, I wanted to address the court's issue about the conversation between Suggs and Ms. Joy. It's our understanding that that conversation was not interpreted, and that it was pretty clear from the conversation itself. And the next day, a search warrant was executed at the home where 22.3 gallons of PCP was found. In terms of deficient performance, the government equates Hampton to looking to the interpretation as if reasonableness or plausibility is the standard. It is not, and the government also views Hampton in what I consider the inverse. That is, if there's nothing in the record to suggest that the opinion was not based on information provided to the jury, then I think Hampton clearly says if the witness does not provide an objective basis to the jury, that opinion violates 701. Thank you, Your Honor. Okay, thank you. We'll take the matter under submission. You can call the next case.
judges: Garland, Wilkins, Edwards